NOTICE

Decision filed 07/28/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 220635-U

NO. 5-23-0635

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 22-CF-7 |
| | ) | |
| JUSTIN D. CARR, | ) | Honorable |
| | ) | Ralph R. Bloodworth III, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE McHANEY delivered the judgment of the court.
Justices Cates and Vaughan[*] concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Where the defendant raised a *pro se* ineffective assistance of counsel claim at a postsentencing hearing, and the trial court did not conduct an adequate hearing pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), we remand this case to the trial court with directions to conduct a *Krankel* hearing.

¶ 2    The defendant pled guilty to charges of aggravated kidnapping and home invasion and was sentenced to 24 years for the aggravated kidnapping charge plus 3 years of mandatory supervised release (MSR) to be served concurrently with a 20-year sentence for home invasion plus 18 months' MSR. The defendant appeals his conviction and sentence alleging that the trial court should have granted his motion to withdraw his guilty plea, that his attorney had an actual conflict

_____

[*]Justice Welch participated in oral argument. Justice Vaughan was later substituted on the panel and has read the briefs and listened to the recording of oral argument.

1

of interest, and that the trial court failed to conduct an adequate *Krankel* inquiry of his *pro se* claim that his attorney was ineffective. For the following reasons, we remand this case with directions for the trial court to conduct a *Krankel* hearing on the defendant's assertions of ineffective assistance of trial counsel.

¶ 3                                     I. BACKGROUND

¶ 4     On January 21, 2022, the defendant and a codefendant were charged with aggravated kidnapping (720 ILCS 5/10-2(b) (West 2020)), home invasion (*id.* § 19-6(a)(3)), aggravated kidnapping (*id.* § 10-1(a)(1), (2)), aggravated criminal sexual assault with the use of a firearm (*id.* § 11-1.30(a)(8)), and aggravated battery (*id.* § 12-3.05(a)(1)).

¶ 5     On April 14, 2022, the State filed a "SUPERSEDING INFORMATION" which contained the original five counts against the defendant, and added three counts: a second home invasion charge (*id.* § 19-6(a)(2)), a second aggravated criminal sexual assault charge (*id.* § 11-1.30(a)(1)), and a kidnapping charge (*id.* § 10-1(a)(2)).

¶ 6     A preliminary hearing was held on April 26, 2022, during which Sergeant Matthew Acray (Acray) of the Carbondale Police Department testified that on January 2, 2022, he was dispatched to the Metropolitan Apartments in Carbondale in response to a possible kidnapping. Katrina Hunter contacted police to report that her granddaughter, Brienna R. Hunter-Travis (Brienna), had been kidnapped; that she was attempting to obtain the demanded ransom money; and that the kidnappers said if she did not get the money, Brienna would be killed. The police department then received information that Brienna had escaped her kidnappers. Acray testified that Brienna had multiple facial and skull injuries, including a skull fracture.

¶ 7     Brienna told the police that she had been asleep in bed and was awakened by two individuals who were beating her. She recognized her assailants, whom she had previously refused

2

entry into her apartment. The defendant struck her head with the butt of a silver gun. Brienna identified the other assailant as Jalyn Rush (Rush), who possessed a semi-automatic handgun, and who kicked her in the face. Brienna stated that the defendant and Rush were looking for the defendant's vehicle. The defendant had previously loaned his vehicle to Brienna's roommate. The defendant told Brienna that he would take her vehicle until his vehicle was returned. Alternatively, the kidnappers told Brienna that they wanted ransom money, and that they intended to kill her, her baby, and her grandmother. Brienna was then transported to a residence she believed belonged to the defendant, where she was placed in a bedroom and told she would be tortured. The defendant forced Brienna to perform fellatio on him, and later to perform fellatio on a dog. The defendant then put Brienna in a car and traveled to an area Kroger grocery store, and then to a Walmart store, where she escaped.

¶ 8    The police interviewed Rush, who implicated herself and the defendant in entering Brienna's apartment, confirmed that the defendant had a handgun, and confirmed Brienna's kidnapping. Rush also said that they beat Brienna in her apartment, and the defendant struck Brienna's head with a shotgun. Rush also said that another unnamed and armed female participated in the attempts to obtain ransom money.

¶ 9    The police also interviewed the defendant who initially claimed that he was not involved with Brienna's kidnapping. When confronted with evidence to the contrary, the defendant provided police with information that placed him at Brienna's apartment. He informed police that Brienna willingly left her apartment with him and Rush. The police showed the defendant surveillance video obtained from Brienna's apartment complex that depicted the defendant carrying a firearm. The defendant told police that he had not gotten his vehicle back after loaning

3

it to Brienna's roommate, and Rush inflicted all of Brienna's injuries. The court found probable cause, and the defendant pled not guilty to all counts.

¶ 10    At the conclusion of the preliminary hearing, the court found that there was probable cause for the case to continue to trial, and the defendant pled not guilty to all counts.

¶ 11    On June 3, 2022, the defendant entered an open plea to one count of aggravated kidnapping and one count of home invasion—both Class X felonies—in exchange for dismissal of the other charges. The defendant volunteered to testify at Rush's sentencing.

¶ 12    After multiple continuances, the defendant's sentencing hearing was held on November 4, 2022. Because Rush's case was still pending, the defendant was unable to testify at her sentencing. With respect to the timing of the defendant's sentencing, the defendant's attorney stated:

> "[A]s the court knows to some regard with all of those court hearings that have been recited during the negotiations of the open plea, one option that [the defendant] was offered and was going to avail himself of was to speak at the codefendant Jalyn Rush's sentencing hearing and that his sentencing hearing would come after that so that the state could take all the information revealed at that sentencing hearing as the state and [the defendant] and I discussed the possibility of presenting a negotiated recommendation, which, as the Court well knows, between an open plea and a sentencing hearing often times there are further discussions between parties as far as presenting a negotiated or a pre-sentence. Due to scheduling and for reasons that of course I'm not aware as I don't have any connection to the codefendant's case, that codefendant has—her sentencing hearing has been continued and I believe may be set next month, and as a result of that, [the defendant] is going first in sentencing hearing, although he has told me that he definitely still wants to make those statements at that hearing when it does occur, so he'd like certainly the state and the Court

4

to note that, even though this scheduling situation has become what it is. He is still anxious, I guess, to speak at that—at that sentencing hearing, and that's all I wanted to alert the Court to."

¶ 13 In response, the court stated the following:

"Understood. Thank you, *** I understand your intent and eagerness to testify, if called, and speak at that sentencing hearing of codefendant ***. I'll note for the record both cases, due to a variety of reasons, scheduling issues, the Court's schedule, trial schedules, PSI's being completed, have been continued and reset a number of times. We'll note for the record the intent of [the defendant] to either testify or make a statement in Ms. Rush's sentencing hearing as well and the Court is familiar with the open plea and what transpired leading up to the open plea for [the defendant] as well as Ms. Rush in her case as well."

¶ 14 The trial court then asked the State if it had anything to say about the defendant's offer to testify at his codefendant's sentencing. The State responded:

"[W]e understand [the defendant's] wish to participate in that sentencing hearing, again, the situation with the timing of that sentencing hearings is what is it, but *we have taken into consideration his wanting to do that in our recommendation to the Court ****[.] [W]e* understand that and we're hoping that he's doing that because he thinks that's the right thing to do and not just to take some years off of his sentence, and so with that being said, *we are giving him the benefit of the doubt that that's what he's going to do and we've considered that and that's worked into our recommendation for *** the Court today,* your Honor." (Emphases added.)

¶ 15 The court sentenced the defendant to 24 years in prison plus 3 years' MSR on the aggravated kidnapping charge, and a concurrent term of 20 years plus 18 months' MSR on the

home invasion charge. The defendant's sentence for aggravated kidnapping would be served at 85%, and the sentence for home invasion would be served at 50%.

¶ 16    On November 16, 2022, the defendant filed two motions. The first motion asked the court to reconsider his sentence. The defendant argued that the sentences were excessive because the court (1) did not weigh the mitigating factors; (2) failed to consider that the victim did not testify in aggravation of sentence and did not submit a victim impact statement; (3) did not consider that the criminal conduct was partly induced by his codefendant, Rush; and (4) did not consider his minor history of criminality. The second motion sought to withdraw his guilty plea and vacate the judgment, arguing (1) that the defendant was not guilty of the crimes charged and (2) that the defendant did not receive a preliminary hearing on the "superseding information" filed on April 14, 2022.

¶ 17    On April 5, 2023, the defendant filed amended versions of his two motions. In his amended motion to reconsider sentence, the defendant included his previous allegations and added the following: (1) that subsequent to his sentencing, Rush received a sentence of 15 years plus 3 years of MSR on the aggravated kidnapping charge; (2) that the court failed to consider evidence submitted at the sentencing hearing that the victim was led out of the apartment building by his codefendant, Rush; and (3) that the court sentenced the defendant before it sentenced Rush despite the State's agreement that Rush would be sentenced first and that the defendant would testify at her hearing. In his amended motion to withdraw his guilty plea and vacate the judgment, the defendant added the argument that he did not receive the benefit of his plea bargain because he did not have the opportunity to testify at Rush's sentencing hearing before he was sentenced.

¶ 18    On August 22, 2023, the trial court held a hearing on the defendant's motions. The defendant's attorney argued that the defendant did not receive the benefit of his agreement with

the State, explaining that Rush kept continuing her case, which forced the defendant to do the same. The trial court's refusal to allow additional continuances resulted in the defendant's sentencing hearing being held first. The State argued that the defendant voluntarily agreed to enter an open plea of guilty and is now unhappy with the sentences he received, and the defendant did not have the absolute right to testify at his codefendant's sentencing. The defendant's attorney responded that the defendant had sought to withdraw his guilty plea prior to sentencing and his current motion was not motivated by the sentences he received. The trial court acknowledged counsel's arguments and denied the defendant's motion to withdraw his guilty plea and vacate the judgment.

¶ 19    Regarding the defendant's motion to reconsider his sentence, his attorney argued that at sentencing the court saw video of Rush leading the victim out of the building. Since Rush only received a 15-year sentence for aggravated kidnapping, the defendant's sentence for that crime should mirror that of his codefendant Rush. The State countered that the situations were different and that each defendant was sentenced accordingly. The defendant's attorney responded that the defendant does not have a substantial criminal history—only traffic charges and one drug possession charge. The trial court also denied the defendant's motion to reconsider his sentences.

¶ 20    The defendant timely appealed.

¶ 21                                    II. ANALYSIS

¶ 22    The defendant argues that he raised *pro se* ineffective assistance allegations in court regarding his attorney's failure to investigate and utilize his mental health records, but the trial court failed to conduct a preliminary hearing pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984). At issue are statements made by the defendant, and the trial court's responses, during a scheduled postplea motion hearing on February 7, 2023, which included:

7

"THE DEFENDANT: *** I asked her when I was in the Department of Corrections to get my mental health records so that we can have them on file and she told me, no, have your family do that. This is the type of relationship we have.

* * *

THE DEFENDANT: *** From day one I told her about my mental thing. She tells me that I—only thing she would do is to see if I was fit to stand trial. That's not what this is about. I was not in my right mind, period. I just lost my mother. I was only back in time to bury them when this crap happened. I wasn't in my right mind, but she never—it never got it mentioned, though, expert testimony or nothing. We never did nothing, but I did let her know all these things, she just let me sit in a cell ***. ***

THE COURT: I understand. What we're going to do is this. All I want is for her to know all the claims that you potentially have.

THE DEFENDANT: She knows them, sir, but she will not do—

THE COURT: And she can only do what she can legally do based upon her legal experience. If there is something frivolous, an attorney is not going to file a frivolous motion, they can't do it.

THE DEFENDANT: *** [W]e don't get along. I told her this during the trial, during everything that's been going on, we don't get along, so how am I going to be represented, if she don't like me and I don't like her, what chance do I stand.

THE COURT: People don't like each other all the time. Patients and doctors don't like each other. We've talked about that time and time again. We spent a lot of hours in court leading up to your trial time in this case.

***

8

THE COURT: \*\*\* I'm going to grant your request, we're going to reset this one final time for a motion to vacate and withdraw your plea and hearing. I'm going to grant her leave to file an amended motion in a new 604(d) certificate saying once again that this has all your claims of error that can be filed legally. I'm going to do this one more time for you and reset it over on another court date, give you time to discuss those things with her and put those in the motion. I think that's the best course of action."

¶ 23    The *Krankel* inquiry was developed to address a *pro se* posttrial motions alleging ineffective assistance of counsel. *People v. Roddis*, 2020 IL 124352, ¶ 34. The goal of the *Krankel* inquiry is to enable the court's complete evaluation and consideration of a defendant's *pro se* claim to create the appellate record and to limit issues on appeal. *People v. Ayres*, 2017 IL 120071, ¶ 13.

¶ 24    In *People v. Moore*, the supreme court established a two-step procedure for handling such claims. *Moore*, 207 Ill. 2d 68, 77-79 (2003). First, once the defendant brings his *pro se* claim to the trial court's attention, the trial court should first examine the factual basis of the defendant's claim to determine if it has merit. *Id.* "If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion." *Id.* at 78. However, if the defendant's allegation shows possible neglect of the case, the trial court should appoint new counsel to evaluate the defendant's claim. *Id.*

¶ 25    "The operative concern for the reviewing court is whether the trial court conducted an adequate inquiry into the defendant's *pro se* allegations of ineffective assistance of counsel." *Id*. In determining whether a *Krankel* inquiry was sufficient, a reviewing court should consider three factors: "(1) whether there was some interchange between the trial court and defense counsel regarding the facts and circumstances surrounding the allegedly ineffective representation, (2) the sufficiency of defendant's *pro se* allegations of ineffective assistance, and (3) the trial court's

9

knowledge of defense counsel's performance at trial and the sufficiency of the defendant's allegations on their face." *People v. Schnoor*, 2019 IL App (4th) 170571, ¶ 71 (citing *Moore*, 207 Ill. 2d at 78-79). There is no unequivocal requirement about what constitutes a sufficient *Krankel* inquiry. *Id.*

¶ 26    To prompt a *Krankel* inquiry, "a *pro se* defendant is not required to do any more than bring his or her claim to the trial court's attention." *Moore*, 207 Ill. 2d at 79. A coherent verbal or written claim asserting ineffective assistance of counsel is sufficient to prompt the trial court's duty to conduct the inquiry. *Ayres*, 2017 IL 120071, ¶ 18. The defendant does not need to use the phrase "ineffective assistance of counsel" to precipitate the need for a *Krankel* hearing. *People v. Lobdell*, 2017 IL App (3d) 150074, ¶ 37. Whether the allegations of ineffective assistance of counsel are sufficient to trigger a trial court's duty to conduct a *Krankel* inquiry is a question of law, and therefore, is subject to *de novo* review. *People v. Cook*, 2023 IL App (4th) 210621, ¶ 64. If the appellate court determines that the trial court did not conduct any inquiry into the defendant's *pro se* claims, the case should be remanded to the trial court for the appropriate inquiry. *Moore*, 207 Ill. 2d at 79.

¶ 27    The State argues that the defendant merely made a "passing remark" about trial counsel failing to obtain his mental health records so that they could be on file at the Illinois Department of Corrections (IDOC). The State contends that trial counsel's failure to collect and place his mental health records on file with IDOC does not implicate counsel's reasonable representation at trial or sentencing. However, the State ignores the fact that the defendant's request for the medical records was to develop possible defense strategies at trial and mitigation evidence at sentencing. Additionally, the defendant repeatedly asked for new counsel throughout the proceedings.

¶ 28    The trial court failed to adequately address the defendant's *pro se* allegations of ineffective assistance of counsel. The record discloses that there was no interaction between the court and defense counsel regarding the defendant's request for his mental health records. Instead, the court merely granted trial counsel additional time to meet with the defendant and to amend any postplea motions and her Rule 604(d) certificate. However, allowing the defendant's attorney additional time to amend pleadings failed to address the defendant's claims of deficient representation.

¶ 29    Accordingly, we remand this case to the trial court with directions to conduct a proper *Krankel* inquiry. We therefore do not reach the defendant's remaining issues on appeal, which he may raise later if necessary.

¶ 30                                    III. CONCLUSION

¶ 31    For the above reasons, we remand this case to the Jackson County circuit court with directions to conduct proper *Krankel* proceedings.


¶ 32    Remanded with directions.

11